

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00417-CR

———————————————

CHRISTON L. JACKSON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1844101

---

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

The jury found Appellant Christon L. Jackson guilty of felony murder as charged in count two of the indictment. *See* Tex. Penal Code Ann. § 19.02(b)(3), (c). Jackson appeals his conviction, claiming (1) that the evidence is insufficient to show that he caused death by striking the victim in the head during a robbery that occurred after the victim was lured to a motel room under false pretenses and (2) that the trial court violated the Confrontation Clause because it did not admit several defense exhibits that allegedly showed bias on the part of an accomplice witness who testified against Jackson. Because the evidence is sufficient to support the offense as charged and because the exhibits were properly excluded, we will affirm.

## II. Background

Piyush Gupta was working at an Economy Inn motel in Fort Worth, Texas, on June 17, 2019. Gupta rented a room to a woman—April Contreras. Later that evening, Gupta became aware that someone was bleeding and "distressed in the parking lot". Gupta approached the man—Ahmad Farid —and gave him towels and water before calling 911. Farid told Gupta that "two guys [had] barged in his room" and that one of them "had a gun in his hand" and had hit Farid on top of his eye. Gupta also testified that Farid had said that the men had stolen his money and his phone. Farid appeared to Gupta to be hurt, upset, confused, and shocked. Gupta later realized that Farid had

2

claimed to have been injured and robbed in the same room that Gupta had rented to Contreras earlier that evening.

Fort Worth Police Department (FWPD) Officer Stephen Pelton was dispatched in response to the 911 call. When Officer Pelton arrived at 11:08 p.m., Farid was already receiving medical attention. Officer Pelton noticed dried blood on Farid's chest, a swollen cut above his left eyebrow, and blood coming from behind his left ear. Farid told Officer Pelton that he had come to the motel to meet up with a woman who was a customer of the convenience store where he worked. According to Officer Pelton, Farid told him that he had met the woman outside the room and that when she opened the door, there was a man with a gun inside.[1] Farid then told Officer Pelton that the man with the gun had taken his wallet, money, phone, and debit cards and then had hit him in the head with the gun. Officer Pelton testified that Farid did not want to go to the hospital and that he was still at the motel when Officer Pelton left about an hour later. Gupta testified that after the police, the fire department, and the ambulance had left, Farid got into a vehicle and drove himself away.

A paramedic, Stephen Lagarce, arrived around 11:00 p.m. and remained at the motel for approximately thirty minutes.[2] Farid told Lagarce that "a female [had] hit him

---

[1]Later in the conversation, Farid described the incident differently to Officer Pelton, stating that about five minutes after he went into the room with the woman, a man with a gun came in, took his property, and hit him in the head with a gun.

[2]The ambulance began taking calls again at 11:38 p.m.

on the left side of his head." Lagarce testified that when he first evaluated Farid, he was alert, appeared to be fine, and did not want to be transported to the hospital. Lagarce said that on the Glasgow Coma Scale (GCS) Farid scored the highest score, meaning that his eye, verbal, and motor responses were the most alert. When he was asked how Farid could have gone from scoring the highest score on the GCS to being "comatose or almost comatose" when he arrived at the hospital two or two and a half hours later, Lagarce surmised that Farid had suffered a brain bleed. Lagarce explained that sometimes head injuries that cause brain bleeding may not initially present as a serious injury because it can take time for symptoms to begin.[3]

Farid's son also testified. He stated that when his father arrived home that night, his "face was full of blood," and he was having problems staying awake, prompting the family to take him to the hospital. Farid was admitted to the hospital at 1:36 a.m. on June 18, 2019. Farid's wife reported to the emergency department personnel that Farid had told her that he "had got[ten] jumped and [that] all his belongings [had been] stolen."

FWPD Detective Thomas O'Brien testified that according to the hospital records, while Farid was waiting in the hospital lobby, he rapidly declined, requiring emergency intubation and a CT scan. The scan showed a "large left epidural

---

[3]The medical examiner provided similar testimony, explaining that it is "very common" for a person with a blunt-force head injury to experience a delay between the time that the wound is inflicted and the time that symptoms begin and that a person with a head injury may even appear lucid or refuse medical care.

4

hematoma"—a blood clot in his skull. The hospital record indicated that Farid's mental status continued to decline, noting that he had a blown left pupil and that he had visible head trauma on his left side.

Farid subsequently succumbed to his injuries. The hospital records include a brain-death note, indicating that Farid's condition was irreversible, that the brain damage was due to an assault and resulting epidural hematoma, and that Farid had no spontaneous respiration on the ventilator. Farid was pronounced brain dead at 9:56 p.m. on June 21, 2019.

Dr. Richard Fries, a deputy medical examiner and a forensic pathologist, performed the autopsy. The autopsy showed that Farid had lacerations on his forehead and another injury on the left side of his head near his ear. According to Dr. Fries, the injury near Farid's ear resulted in an epidural hematoma that was responsible for his death. The official cause of death was blunt-force trauma to the head, and Farid's death was classified as a homicide.

During his investigation, Detective O'Brien identified four individuals who were linked to Farid's injuries and death: Jackson, Contreras, Tabitha Thomas, and Maurice Washington. All four suspects were arrested.

Washington testified that he, his girlfriend Thomas, Contreras, and Jackson created a plan to rob Farid. The plan included Contreras's and Thomas's providing sexual favors to Farid at the Economy Inn, and Jackson's performing the robbery. The plan was for Contreras to leave the motel room door open for Jackson, providing easy

5

access to Farid. According to Washington, the crime was meant to be a nonviolent interaction.

The State presented evidence corroborating this plan. Detective O'Brien testified that he discovered text messages between Contreras and Farid setting up the "price" and between Contreras and Jackson, in which Contreras told Jackson the room number at the motel and that the door was open. Detective O'Brien also discovered surveillance footage that showed Contreras, Farid, and a man matching Jackson's description all at the motel that evening.

Washington testified that after the incident, Thomas told him things had not been nonviolent.[4] When Washington first confronted Jackson about this, Jackson denied assaulting Farid, but when Washington brought it up again, Jackson told him that "the victim had resisted in some way." Washington said that he had accused Jackson of lying to him—based on the information Washington had from Thomas— and that he was upset with Jackson because his actions caused "everybody to get caught up in the crime." Washington also testified that after the incident, Jackson had a phone and a wallet that did not belong to Jackson.[5]

---

[4]Washington had dropped Jackson off at the motel after Contreras and Thomas began the plan; Washington was not present during the robbery and assault of Farid.

[5]Farid's wallet and cards were later recovered from a vehicle belonging to Contreras.

After the State rested its case-in-chief, the defense moved for a directed verdict as to each of the five counts in the indictment. The trial court overruled the motions as to each count. The jury found Jackson not guilty of count one; guilty of murder as charged in count two; and per the jury instructions, did not reach counts three, four, or five. The jury also assessed punishment at seventy years' confinement in the Institutional Division of the Texas Department of Criminal Justice, and the trial court sentenced Jackson in accordance with the jury's recommendation.

### III. Sufficiency of Evidence

In his first issue, Jackson contends that the trial court erred in overruling the motions for directed verdict because the evidence was not sufficient to support that he had caused Farid's death.[6] To the contrary, the evidence is sufficient.

### A. Standard of Review

In an evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences

---

[6]"We treat a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence." *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021).

It is not part of the State's burden to rebut every reasonable hypothesis that may be inconsistent with a defendant's guilt. *Zuniga v. State*, 551 S.W.3d 729, 739 (Tex. Crim. App. 2018); *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) ("Although the State must prove that a defendant is guilty beyond a reasonable doubt, the State's

burden does not require it to disprove every conceivable alternative to a defendant's guilt."); *Temple v. State*, 390 S.W.3d 341, 363 (Tex. Crim. App. 2013).

**B. Applicable Law**

Count two of the indictment alleged that Jackson

> commit[ted] a felony, namely, robbery, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, [Jackson] committed or attempted to commit an act clearly dangerous to human life, namely, by striking Ahmad Farid with a firearm and/or by striking Ahmad Farid with [Jackson's] hand, and thereby caused the death of Ahmad Farid.

This offense is known as felony murder and has two essential elements: (1) "the defendant committed or attempted to commit a felony, other than manslaughter," and (2) "in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the defendant committed . . . an act clearly dangerous to human life that caused the death of the individual." *Jimenez v. State*, No. 02-23-00348-CR, 2025 WL 211319, at \*6 (Tex. App.—Fort Worth Jan. 16, 2025, no pet.) (mem. op., not designated for publication) (first citing Tex. Penal Code Ann. § 19.02(b)(3); and then citing *Nguyen v. State*, 693 S.W.3d 732, 736–37 (Tex. App.—Houston [14th Dist.] 2024, no pet.)).

Here, the underlying felony alleged was robbery. *See* Tex. Penal Code Ann. § 29.02(a)(1) ("A person commits an offense if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another[.]"). The

alleged act clearly dangerous to human life was the striking of Farid—either by Jackson's hand or with the use of a firearm.

## C. Discussion

On appeal, Jackson challenges only the element of causation. Jackson argues that there was insufficient evidence to show that he caused Farid's fatal injury—at the motel or elsewhere. Jackson hypothesizes that Farid, in the interim between being struck by Jackson and arriving at the hospital, could have received a second injury either by falling or by being struck by a person other than Jackson. Jackson's argument is unpersuasive for two reasons.

First, much of Jackson's argument focuses on the *possibility* that Farid's injuries occurred outside of the alleged robbery—particularly the injury near his left ear, which was identified as the trauma that caused Farid's death. To support this argument, Jackson provides several other possible explanations that were not disproven by the State. From a legal standpoint, this is an attempt to require the State to disprove hypotheses contrary to Jackson's guilt. As we have noted, this is not a burden that the State is required to carry. *See Tate*, 500 S.W.3d at 413. Thus, despite the existence of testimony that may have supported alternative theories, the State was under no obligation to explore or refute these hypotheses.

Second, circumstantial evidence is as probative as direct evidence in establishing guilt; thus, the testimony—that Farid had told witnesses that he had been hit on the

10

head with a gun[7] during the robbery at the motel and that Farid had visible injuries on his head—and the evidence—that Jackson was present at the motel, part of the robbery, and had hit Farid during the robbery—all tends to connect Jackson to the crime and is all sufficient to support the jury's verdict. *See Carter*, 620 S.W.3d at 149.

Jackson argues that the evidence could instead support his hypothesis that Farid sustained his injuries, the one above his eye and the one behind his ear, from two separate events. He proposes that the ear injury, the fatal injury, must have occurred after Farid left the motel. To support this argument, Jackson contends that because Farid appeared to be alert and oriented when he was evaluated by the paramedic at the motel and because there was a "time gap" between when the injury allegedly occurred and when he arrived at the hospital, there must have been a separate, subsequent injury—not perpetrated by Jackson—that caused Farid's death. However, this theory is not borne out by the record:

- Officer Pelton stated that Farid had two head injuries on his left side when he responded to the robbery call at 11:08 p.m. The pictures taken by Officer Pelton at the motel show that Farid was already bleeding behind his left ear (the same location of the blow that killed him) when the officer arrived.
- Security footage showed that Contreras and Thomas had left the motel at 10:44 p.m. and that Jackson had left the motel at 10:47 p.m.

---

[7]Farid's statements to Gupta, Officer Pelton, and Lagarce differed as to who and what caused his injuries. Farid told Gupta that there were two guys and that he had been hit on top of his eye with a gun. Farid told Officer Pelton that a man had hit him in the head with a gun. Farid told Lagarce that a woman had hit him on the left side of his head; the narrative in Lagarce's report says that a woman had punched Farid.

11

- Gupta, the motel employee, testified that Farid was in shock and in pain; and that he was confused, bleeding, and upset shortly after the incident occurred.
- Lagarce, the paramedic, said that when he first evaluated Farid at about 11:00 p.m., he was alert, appeared to be fine, and did not want to be transported to the hospital. The ambulance left at 11:38 p.m., and the evidence presented indicates that Farid was still at the motel.
- When given a hypothetical about how Farid could have been alert and oriented when he was evaluated but then was "either comatose or almost comatose" when he arrived at the hospital some two or two and a half hours later, Lagarce—using his paramedic training—speculated that Farid had suffered a brain bleed.
- Lagarce also testified that sometimes head injuries and brain bleeding may not initially present as a serious injury and that it may take time for it to become apparent how serious the injury is.
- Dr. Fries, the medical examiner, testified that it is "very common" for a person with a blunt-force head injury like Farid's to experience a delay between the time the wound is inflicted and the start of symptoms. Dr. Fries explained that "it can take time for enough pressure to build up and blood to collect . . . to then cause the compression of the brain" and that it can take minutes to hours for symptoms to begin.
- Dr. Fries also explained that the time between when an injury is inflicted and symptoms begin is classically referred to as a "lucid interval" and the injured person could be acting normally and could even refuse medical care. Because of this behavior, Dr. Fries testified that it is possible for medical personnel to overlook the severity of the injury.
- Officer Pelton recalled that he was at the motel for "about an hour"— departing shortly after midnight—and that Farid was still at the motel when Officer Pelton left.
- Farid was admitted to the hospital at 1:36 a.m. on June 18, 2019. His wife told the hospital that Farid had said that he "had got[ten] jumped and [that] all his belongings [had been] stolen."

Thus, contrary to Jackson's argument, this evidence supports that both of Farid's head injuries manifested before he left the motel; that brain bleeding symptoms often arise later and rapidly; and that there was a very short gap in time between the time of his

12

injuries and his arrival at the hospital, i.e., in the time frame that Jackson contends Farid could have suffered a mysterious second injury.

The jury was permitted to evaluate the credibility of the witnesses in making their determinations. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell*, 620 S.W.3d at 914. Thus, we hold that the evidence is legally sufficient to support that, in the course of the robbery, Jackson inflicted the blunt-force injury[8] to Farid that caused his death.

We overrule Jackson's first issue.

## IV. Confrontation Clause

In his second issue, Jackson contends that his Sixth Amendment rights were violated when the trial court excluded three exhibits[9] that were offered to show Washington's bias toward the State when testifying against Jackson. Again, we disagree.

### A. Applicable Law and Standard of Review

The Sixth Amendment right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-

---

[8]Jackson points out that Dr. Fries did not "match" a specific gun to Farid's fatal wound. However, Dr. Fries testified that the injury that killed Farid was consistent with being struck with a gun. The State was not required to identify a specific deadly weapon because it presented evidence of the manner in which the weapon was used and the injury suffered as a result. *See Briones v. State*, 692 S.W.3d 828, 840 (Tex. App.—San Antonio 2024, no pet.) (first citing *Mixon v. State*, 781 S.W.2d 345, 346 (Tex. App.—Houston [14th Dist.] 1989), *aff'd*, 804 S.W.2d 107 (Tex. Crim. App. 1991); and then citing *Stanul v. State*, 870 S.W.2d 329, 334–35 (Tex. App.—Austin 1994, pet. ref'd) (per curiam)).

[9]These exhibits contained two indictments and a dismissal for alleged offenses related to Washington but were not related to the offense against Farid.

13

interest, or motives in testifying. *Johnson v. State*, 490 S.W.3d 895, 897 & n.1 (Tex. Crim. App. 2016) (remanding for Rule 44.2(a) harm analysis on exclusion of evidence of victim's past sexual behavior). A defendant's Sixth Amendment right to confront witnesses may be violated by disallowing a certain line of questioning during cross-examination of the State's principal witness against the defendant. *See Jones v. State*, 571 S.W.3d 764, 765 (Tex. Crim. App. 2019). We first determine whether the evidence was excluded in error. *Davis v. State*, 203 S.W.3d 845, 851 (Tex. Crim. App. 2006).

A trial court's ruling on the admissibility of evidence is reviewed under an abuse-of-discretion standard. *Colone v. State*, 573 S.W.3d 249, 263–64 (Tex. Crim. App. 2019). A trial court abuses its discretion when its decision "falls outside the zone of reasonable disagreement." *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016). We will not reverse the trial court's decision to exclude evidence unless the ruling "was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)). Nor will we reverse a ruling that is "correct under any applicable theory of law." *Johnson*, 490 S.W.3d at 908.

A defendant's constitutional right to confront witnesses is subject to the reasonable control of the trial court. *Irby v. State*, 327 S.W.3d 138, 145 (Tex. Crim. App. 2010). Although a witness may be impeached with relevant evidence, it is not permissible to contradict or impeach a witness on immaterial or collateral matters. *Wamsley v. State*, No. 2-06-089-CR, 2008 WL 706610, at *8 (Tex. App.—Fort Worth

14

Mar. 13, 2008, pet. ref'd) (mem. op., not designated for publication) (first citing *Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990); and then citing *Keller v. State*, 662 S.W.2d 362, 365 (Tex. Crim. App. 1984)).

To be admissible—even in the face of a Confrontation Clause claim—the proffered testimony must still have some "causal" or "logical" connection to the alleged bias. *Johnson v. State*, 433 S.W.3d 546, 552–53 (Tex. Crim. App. 2014). The Court of Criminal Appeals has explained that the "causal connection" requirement "is ultimately rooted in the concept of relevance." *Id.* at 552. Thus, whether the proffered evidence is relevant is the first step in a trial court's decision to either admit or exclude the evidence. *See Henley*, 493 S.W.3d at 83. As the Dallas Court of Appeals has stated

> The proponent of evidence that allegedly establishes bias must show that the evidence is relevant by demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's potential motive to testify in favor of the other party. *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004). The trial court does not abuse its discretion in excluding evidence of the alleged bias if the proponent of the evidence does not establish the required nexus. *Smith v. State*, 352 S.W.3d 55, 64 (Tex. App.—Fort Worth 2011, no pet.).

*Turner v. State*, No. 05-22-00785-CR, 2023 WL 7037162, at *4 (Tex. App.—Dallas Oct. 26, 2023, no pet.) (mem. op., not designated for publication).

In the context of a witness's credibility, relevance does not depend on whether the proffered evidence definitively proves the alleged bias. *Johnson*, 433 S.W.3d at 552. Rather, "it need only 'make the existence' of bias 'more probable or less probable than it would be without the evidence.'" *Id.* (quoting Tex. R. Evid. 401). "A defendant does

15

not have an unfettered right to present evidence that has no relevance." *See Henley*, 493 S.W.3d at 83. A witness who may "be on probation, have pending charges, be in the country illegally, or have some other 'vulnerable status' [is not] automatically subject to cross-examination with that status." *Irby*, 327 S.W.3d at 152. The cross-examiner is still required to show the relevance of the "vulnerable status" or any other alleged bias of that witness. *Id.* at 151–52.

## B. Discussion

Here, the trial court excluded defense exhibits 11, 12, and 13; the excluded exhibits are related to Washington's criminal history and include the indictment and dismissal of a misdemeanor assault family violence charge in 2011 (exhibits 11 and 12) and an indictment and plea paperwork (but not a judgment of conviction) for a third-degree felony assault family violence offense—also from 2011 (exhibit 13).[10] Defense counsel argued at trial that the documents were offered "to show [Washington's] incentive to get a better deal" and his potential bias in testifying against Jackson.

Despite the exclusion of defense exhibits 11, 12, and 13, the trial court admitted multiple other documents related to Washington's criminal history:

- The paperwork for four convictions for burglaries of a habitation that occurred in 2000, 2001, 2011, and 2021. The conviction for the 2021 offense was the result of a plea bargain signed in 2024 that included a

[10]The motion to dismiss was filed because Washington was apparently convicted in the cause number that was the subject of defense exhibit 13. As we have noted above, defense exhibit 13 did not contain a judgment of conviction, but the cause number referenced in the motion to dismiss in defense exhibit 12 matches the cause number in defense exhibit 13.

requirement that Washington truthfully testify against his co-defendants in Farid's murder trial. The plea bargain included the dismissal of four other pending indictments.

- The paperwork for the four pending indictments[11] that were dismissed as part of the plea bargain that also required Washington's truthful testimony against his co-defendants in their trials for the murder of Farid.
- The final judgment paperwork for a third-degree felony possession of a controlled substance—methamphetamine—that occurred in 2018. This judgment was imposed on the same day—May 13, 2024—as the 2021 burglary of a habitation judgment; both judgments included the provision that Washington provide truthful testimony against his co-defendants in their trials for the murder of Farid.
- The plea paperwork for the conviction for the lesser-included offense of aggravated robbery with a deadly weapon on an indictment for a capital murder that occurred in 1999.

The trial court also permitted testimony about Washington's criminal history:

- Washington testified about his criminal history and his prior incarcerations. He was also cross-examined extensively about his criminal history.
- Defense specifically cross-examined Washington about the plea bargain that required his truthful testimony against his co-defendants in Farid's murder trial.

Further, Washington testified about the offenses described in the excluded exhibits.

The jury heard Washington's affirmative answers to the following questions:

- "[T]hen 11 and 12, there is an indictment for a misdemeanor offense, assault on a family member, that was also dismissed by the State on April the 20th of 2012. You remember that?"

---

[11]The four criminal cases that were dismissed as part of the 2024 plea bargain included indictments for (1) possession of marijuana of four ounces or more but less than five pounds in 2018; (2) the felony murder of Farid during the commission or attempted commission of robbery in 2019; (3) assault bodily injury in 2021; and (4) possession with intent to deliver methamphetamine, a controlled substance, of four grams or more but less than two hundred grams.

- "Number 13 . . . is assault on a family member, two or more times within a year. That's a felony. You understand that, right?"

Then, defense counsel asked if Washington had received "four years" for the charge in defense exhibit 13, and Washington again answered in the affirmative. Thus, although the documents were later excluded, the content of the exhibits was not.[12] To establish that the excluded defense exhibits were relevant to Washington's bias in testifying, Jackson was required to show that the two indictments and the dismissal were logically connected to these alleged biases. *See Chavez v. State*, No. 02-22-00090-CV, 2023 WL 7400981, at *5 (Tex. App.—Fort Worth Nov. 9, 2023, pet. ref'd) (mem. op., not designated for publication). In defense exhibits 11 and 12, the alleged misdemeanor offense did not result in a conviction and occurred almost eight years prior to the instant offense; additionally, it was not dismissed as part of the plea agreement made in exchange for Washington's testimony in this case.

---

[12]Therefore, even if we were to conclude that the trial court erred in excluding these exhibits, there would be no reasonable possibility that such error contributed to Jackson's conviction. *See* Tex. R. App. P. 44.2(a); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g) (explaining that similar testimony from other witnesses mitigates against the harmfulness of any error in excluding testimony from another witness); *see also* Tex. R. Evid. 403 (stating that a trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of needlessly presenting cumulative evidence); *Guerra v. State*, 942 S.W.2d 28, 33 (Tex. App.—Corpus Christi–Edinburg 1996, pet. ref'd) (citing *Womble v. State*, 618 S.W.2d 59, 61 (Tex. Crim. App. [Panel Op.] 1981), and stating that "[t]he standard on exclusion of cumulative evidence and harmless error dictates that no harm results when evidence is excluded if other evidence of substantially the same nature is admitted.").

The State points out in its brief that because there was no potential for the charges to be refiled against Washington, it was not possible for the State to use the dismissal to "sway" or "bias" Washington's testimony. We agree. Although the misdemeanor offense was not "dismissed with prejudice" in 2012, it nevertheless could not be refiled at the time the offense against Farid occurred in 2019, as it was outside the three-year statute of limitations time frame. *See* Tex. Code Crim. Proc. Ann. art. 12.02(b). Therefore, the alleged misdemeanor offense was not relevant to Washington's potential bias in testifying against Jackson. *Cf. Morgan v. State*, 740 S.W.2d 57, 59 (Tex. App.—Dallas 1987, pet. ref'd) (citing *Simmons v. State*, 548 S.W.2d 386, 388 (Tex. Crim. App. 1977)).

Additionally, both alleged offenses occurred in 2011 and concerned assault family violence violations. *See* Tex. Penal Code Ann. § 22.01. These offenses are neither material nor collateral matters to the alleged felony-murder offense committed against Farid (predicated on the underlying robbery offense). *Compare* Tex. Penal Code Ann. § 22.01 (assault), *with id.* § 29.02 (robbery), *and id.* § 19.02(b)(3) (felony murder). As a result, the excluded exhibits are not logically connected to Washington's alleged bias in testifying on behalf of the State. *See* Tex. R. Evid. 401; *see also Irby*, 327 S.W.3d at 152. Thus, defense exhibits 11, 12, and 13 were not relevant in this instance.

Considering that the excluded exhibits were not relevant to Washington's potential bias and considering that evidence was admitted showing Washington's extensive similar criminal history as an indication of his possible bias in testifying against

19

Jackson, we cannot conclude that the trial court's decision to exclude the three exhibits was outside the zone of reasonable disagreement. *See Henley*, 493 S.W.3d at 83. Because we hold that the trial court did not err, we overrule Jackson's second issue.[13]

## V. Conclusion

Having overruled both issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 26, 2026

---

[13]Because there is no error, we need not conduct a constitutional harm analysis. *See* Tex. R. App. P. 44.2(a), 47.1.